UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA : 3:03CR229(RNC)

VS.

FAUSTINO FLEURY : JUNE 17, 2005

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

**I. Defendant's Background**

Defendant Fleury feels that the United States Probation Officer's description of his family background, early years, education and development within the community and the difficult circumstances in which he grew up is substantially accurate and fair to him, although there are certain of these factors on which the Defendant will make rather extensive comment in the context of other topics covered below.

**II. General Sentencing Factors**

A. <u>Post-Booker Overall Analysis</u>

The Defendant and the undersigned would like first to offer their understanding - at first, in a rather general way - of the climate which currently exists in any federal court with regard to sentencing in the wake of <u>United States v. Booker</u>, ___U.S.___, 125 S. Ct. 738 (2005).

First, it is important to note the obvious: that the United States Sentencing Guidelines are no longer mandatory, but are now, rather, "advisory"; but that the Guidelines must still be "considered" by every sentencing Court, along with the other

factors mentioned in the primary federal sentencing statute, 18 U.S.C. § 3553(a).

But to refine exactly what these two fundamental principles will mean going forward will undoubtedly take time.

The United States Court of Appeals for the Second Circuit, in <u>United States v Crosby</u>, 397 F. 3d 103 (2d Cir. 2005), offered a helpful overall guide for applying the principles of <u>Booker</u> which was summarized as follows:

> Thus, at this point, we can identify several essential aspects of <u>Booker/ Fanfan</u> that concern the selection of sentences. First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553 (a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553 (a), whether (I) to impose the sentence that would have been imposed under the Guidelines, <u>i.e.</u>, a sentence within the applicable Guidelines range or within permissible departure authority or (ii) to impose a non-Guidelines sentence. Fifth, sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence. *Id* at ____.

The undersigned doesn't believe that the Second Circuit meant either to make this process too mechanical, or to suggest that the <u>first</u>, arguably more important or favored category is to be within the Guidelines. But such a possible interpretation should be addressed.

Fortunately the <u>Crosby</u> Court, immediately before setting forth the five key elements it saw in <u>Booker</u>, remarked as follows:

> We need not on this appeal endeavor to determine what degree of consideration is required, or, to put it another way, what weight the sentencing judge should normally give to the applicable Guidelines range. We think it more consonant with the day to day role of district judges in imposing sentences and the episodic role of appellate judges in reviewing sentences, especially under the new applicable standard of "reasonableness", to permit the concept of "consideration" in the context of the applicable Guidelines range to evolve as district judges

2

faithfully perform their statutory duties.

As to "what degree of consideration is required", although Crosby's suggestion that the analysis be done on a "day-by-day" or case-by-case basis certainly makes sense; nevertheless, in any given case it may be appropriate if not absolutely necessary to analyze the weight which should be given to the Guidelines as compared with the weight to be given other § 3553 factors.

Importantly, there appear to be no suggestions in either majority decision in the Booker case to suggest that the Guidelines be given any priority or presumptive consideration in weighing all of the sentencing factors. United States v. Booker, ____ U.S. ____, 125 S. Ct. 738 (2005) at 790 (Scalia, J., dissenting in part). In fact, to accord the Guidelines any "presumptive" correctness or priority among the other factors would be tantamount to giving them quasi-mandatory status, which would certainly run afoul of the spirit and letter of Booker. United States v. West, ____ F. Supp. 2d ____, 2005 WL180930, at *2,3 (S.D.N.Y. Jan. 27, 2005). At the same time, just how we use the Guidelines - or, perhaps, the patterns courts develop for utilizing them along with the other sentencing factors - will obviously take some time to evolve.

For his part, Justice John Paul Stevens noted in Booker that the Guidelines are now "nothing more than a suggestion that may or may not be persuasive to a judge when weighed against the numerous other considerations listed in 18 U.S.C.A. § 3553 (a)." Booker, 125 S. CT. at 787 (Stevens, J., dissenting in part). A district court commented that "Booker **is not** an invitation to do business as usual." United States v. Ranum, 2005 WL 161223, at *2(E.D. Wis. Jan. 19, 2005 (emphasis added). And, post-Booker, it is now arguably much more important than it was before to pay close attention to the very

first sentence and set of references in the sentencing statute itself:

### § 3553 Imposition of a sentence

(a) **Factors to be considered in imposing a sentence.** - The court shall impose a sentence *sufficient, but not greater than necessary* to comply with the purposes set forth in paragraph (2) of this subsection. . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . to afford adequate deterrence . . to protect the public from further crimes . . . to provide the defendant with needed educational or vocational training . . . (emphasis added).

B. <u>What Some of the Courts Have Held</u>

Against the admittedly rather general analysis of <u>Booker</u> which is offered above, we now turn to what some of the federal courts have written in specific cases.

In a case called <u>United States v. Ranum</u>, <u>supra</u>, the District Court for the Eastern District of Wisconsin offered the following comment about consideration of the guidelines as well as the other §3553(a) factors:

> I agree that courts must in all cases seriously consider the guidelines. The Commission has collected a great deal of data over the years and studied sentencing practices. Thus, courts not imposing sentences within the advisory guideline range should provide an explanation for their decision. But in so doing courts should not follow the old "departure" methodology. The guidelines are not binding, and courts need not justify a sentence outside of them by citing factors that take the case outside the "heartland." Rather, courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the §3553(a) factors. <u>Id</u>.

The sentencing Judge in <u>Ranum</u> also dealt in an interesting fashion with some of the non-Guidelines § 3553 (a) factors. (The offense in <u>Ranum</u> involved the misapplication of bank funds by a loan officer who exceeded his loan authority and misled the employer Bank.) The sentencing Judge noted that "[u]nder § 3553 (a) and the

decisions of the Supreme Court, a sentencing court may properly consider a defendant's motive. [citing] Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993) (stating that 'the defendant's motive for committing the offense is an important factor')."

In this case, as is discussed in much more detail below, Mr. Fleury was not in the drug business. He came to New Haven to get work, although he did know what Daisy was doing. But she had told him that there was factory work in New Haven, and Mr. Fleury has always been a hard worker. He simply wasn't getting enough construction work in Puerto Rico.

Another well reasoned sentencing opinion is found in United States v. Jose Huerta-Rodriguez, No. 04 CR 365 in the United States District Court for the District of Nebraska, Joseph F. Bataillon, J. While noting that "the contention that Booker signals a return to pre-Guidelines discretion is an overstatement"; nevertheless the United States v. Jose Huerta-Rodriguez sentencing makes some very thoughtful observations about the history of the Guidelines and their application that are not often made. The Court noted with some detail that the effectiveness of the Guidelines in reducing sentencing disparity is "heavily dependent on fair and reasonable consistent charging policies in the Department of Justice." (citing United States Sentencing Commission, Fifteen Years of Guideline Sentencing (Nov. 2004) at 23-24.) The Court notes that, for various reasons, charging policies have not, in fact, been consistent across the board. The court also noticed regional disparities in application of the Guidelines, especially with regard to immigration offenses.  And, "[g]overnment motions for departures for substantial assistance have also contributed significantly to disparity and unfairness under the Guidelines." [citing] Id at xiii. (While there is no direct application of this observation to

5

Mr. Fleury's case, it is true that he successfully completed those steps necessary for the "safety valve" treatment, notably the interview in which he described fully what he did and what he knew; and, if the overall case had been in a different posture and timing, it certainly appeared that he would been able to offer "substantial assistance".

The Court in <u>Huerta-Rodriguez</u> went on to describe its own approach as follows:

> Accordingly, with the knowledge that the Guidelines do not necessarily represent a reliable indication of reasonableness in every case, the court will take the Guidelines into account, making an individual assessment of the reasonableness of the proposed Guidelines range in conjunction with the nature and circumstances of the offense and the history and characteristics of the defendant. See 28 U.S.C. § 3553(a).

The court in <u>Huerta-Rodriguez</u> did a standard Guideline calculation, then included a "fast track" immigration departure and arrived at a sentencing range of 57-70 months. (The offense of conviction, to which defendant had plead, was 8 U.S.C. § 1326(a)(b)(2) – Illegal Entry after prior conviction of an aggravated felony.) The court did note, however, that the enhancement to the assault offense which raised the base offense level of the earlier offense from 8 to 24 was for behavior that occurred almost ten years before sentencing in the present case. The court also noted that the defendant had been working and living in Nebraska for some time and was now married to a citizen. Further, the court noted that, although there were enough criminal history points to initially place the defendant in criminal history category V, the bulk of the offenses were relatively old and were for alcohol related incidents. The court went on to sentence the defendant to 36 months, commenting that such a sentence will adequately reflect the offense seriousness, promote respect for the law, provide just punishment and afford adequate deterrents."

### III. <u>Factors Specific to Mr. Fleury</u>

1. What actually happened here (the "offense conduct")

There isn't much question that the two heroin delivery operations which were the subject of the Government's prosecution which resulted in Mr. Fleury's arrest and guilty plea were sizeable and had some sophisticated elements, but it is much more difficult to assess exactly what Mr. Fleury's role was. He appears to be a very unsophisticated, certainly uneducated (see below) man, older than many people who become involved in drug delivery operations, and in many ways ingenuous in his dealings with the outside world. But he doesn't claim that he didn't know what he was doing. He <u>does</u> point out that he was arrested only eight (8) days after coming to New York (and then New Haven) at the request of Daisy Sanchez who, he says, played on the fact that he was having trouble finding construction work in Puerto Rico and told him she could connect him with factory work in Connecticut. But he did make deliveries to certain places Daisy pointed out to him.

It should be noted that, during the plea colloquy before Magistrate Judge Martinez on March 30, 2005, Mr. Fleury explained that he didn't even know <u>what</u> illegal drugs he was delivering, but he assumed it was either cocaine or heroin. Also, the Government proffer by Assistant United States Attorney Gordon Hall pointed out specifically that the Government did <u>not</u> claim either that Mr. Fleury ever owned more than one kilogram of heroin, or that more than one kilogram ever "passed through his hands" in the course of the Daisy Sanchez operation; only that it was "reasonably foreseeable" to Mr. Fleury that more than one kilo but less than three were involved in the operation.

These things are pointed out not for the purpose of making a traditional guideline departure argument based on less important role in the offense; rather, they are mentioned in order to help paint what might be called a three-dimensional picture of Mr. Fleury so

that he might be sentenced appropriately.

## 2. History and Characteristics of the Defendant

### a. Personal and family history

Mr. Fleury was one of eleven children (some half-siblings). His family was extremely poor. The family home had two rooms. At the age of 7, he began working for a neighbor to help provide income and food. Not infrequently there was not enough food. Water came from the nearby river, light from lanterns. Because of the need for his (and the others) to work, he has essentially no formal education. At the age of 11, he had to relocate to the City of Santo Domingo to live with one of his brothers and help him work at a gas station so they could send money home to their Mother.

The undersigned would suggest that a family background like this is both: (1) outside the "Heartland" of the circumstances contemplated by the United States Sentencing Guidelines (indeed, a family living this way in Connecticut would have DCF encamped on their front steps on a permanent basis); and (2) illustrative of some of the personal characteristics that the U.S.S.G. specifically prohibit from consideration in arriving at a sentence - education and vocational skills, § 5H1.2; family ties and responsibilities, § 5H1.6; socio-economic status, § 5H1.10; and lack of guidance as a youth, § 5H1.12. (These factors and others are cited and described in United States v. Ranum, supra).

### b. Personal characteristics and qualities

Mr. Fleury has always presented to the undersigned as quiet, polite and respectful. He also seems to have a very deep affection for family and others close to him.

When describing the family and his Mother - "The poor woman, she raised us all.

She was a small, little woman." (Pre, ¶ 32), the notes of the undersigned (who was of course there) indicate that he got very tearful in recalling he death and stayed that way for several minutes. Later in the interview he mentioned that he and his Wife adopted a little girl who was the daughter of a friend who had been killed, and whose Mother died in childbirth. (This little girl, Casey Joanna Rodriguez-Rivera is now 7 and living in Puerto Rico with Mr. Fleury's Wife). He said that [or words to this effect] "[s]he made me very happy recently because she told me that the dog I gave her had 5 puppies." Mr. Fleury's broad smile and loving appreciation of this were palpable and animated.

At this point, counsel would like to quote Mr. Linder's paragraph 63, which, it is felt, calls out for some special treatment for Mr. Fleury in the crafting of a creative and fair sentence:

> The defendant described a childhood and youth <u>which few would understand in the United States.</u> He stated that he had been helping to support his mother and siblings since the age of seven, contributing to the family income, along with his siblings, as a means of putting food on the table and clothes on their backs. It was reported that his non-attendance at school was normal for the area where there was no accountability on the part of the school or the parent when children did not conform up to any kind of standard. Mr. Fleury indicated that few attempted to gain knowledge from books as opposed to working in the fields and the city near Santo Domingo. The defendant asserted that while he did not participate in formal education, he learned a work ethic which he has carried with him through his adulthood. According to Mr. Fleury's description of his life, he has also taken part in a noble act by taking care of a friend's daughter. Given the telling of his love and need to be with his family, <u>one must ponder the circumstances</u> which would drive him to put himself in harm's way, at least in the separation from those he loves and cares for. (Emphasis added).

### IV.    **Grounds for Downward Departure**

#### A. **Unavailability of Bureau of Prisons Programs**

Defendant is married to a citizen of Puerto Rico. For that reason, it is believed that his

9

coming to the Untied States shortly before his arrest in August of 2003 was legal. Now that he has been convicted of a crime, it is believed that he will be treated as an illegal alien on his release from confinement. Because of this, he will not be eligible for certain Bureau of Prisons programs. These include, at the least, the Bureau of Prisons' 500 hour intensive drug treatment program, which, on information and belief, results for those inmates who complete it successfully in a reduction of sentence of at least twelve (12) months; assignment to a minimum security facility; and half-way house or community release programs. (It should be pointed out that Mr. Fleury is not a drug user, and never has been. Nor has he abused other substances. However, counsel is not so sure that the BOP doesn't admit some inmates into the 500 hour intensive program anyway, for general counseling. In any case, Mr. Fleury will not be eligible.)

While a number of Circuit Courts of Appeal in the past have followed or rendered opinions consistent with that of the Second Circuit in United States v. Restrepo, 999 F.2d 640 (2d Cir. 1993); the better view, at least in opinions handed down since that of the United States Supreme Court in Koon v. United States 116 S. Ct. 2035 (1996), appears to be represented by the decision of the Seventh Circuit in United States v. Farouil, 124 F.3d 838 (7th Cir. 1997). There, the Defendant argued in the District Court that he should be granted a downward departure because of his status as a deportable alien. The Circuit Court first noted the general rule that, had the lower Court's decision simply been an exercise of its discretion not to depart based on the particular facts argued by Defendant relating to his alien status, the decision would not even be reviewable. But the District Court had indicated its belief that there simply was no discretion to depart downward for the reasons offered. As the Seventh Circuit characterized it:

10

    The Court did not address Farouil's claim that he would be ineligible to serve any part of his sentence in a minimum security facility, that his entire family resides in France, that he has no friends in the United States, that he will be unable to have any regular contact with his family or friends for an extended period of time, and that the cost to the Unites States of his incarceration will approach half a million dollars. Instead, the court elected to follow the Second Circuit's decision in <u>United Sates v. Restrepo</u>, 999 F.2d 640 (2d Cir. 1993), cert denied, 510 U..S. 954 (1993). In <u>Restrepo</u>, the court noted, a defendant's ineligibility to serve the last six months of his confinement in a halfway house, and inability to serve any of the sentence in a minimum security prison did not warrant a downward departure: "[T]he court follows <u>Restrepo</u> in holding that [status as a deportable alien] is an inappropriate basis for departure, constituting an encroachment on the Bureau of Prisons' broad discretion over assignment of prisoners." <u>Id</u>, at 845.

After citing other cases with results similar to those in <u>Restrepo</u>, the Seventh Circuit went on to note that "[w]hat all of these opinions have in common is that they all preceded <u>Koon v. United States</u>, *supra*." Then, after giving a short and general summary of the holding in <u>Koon</u>, the Seventh Circuit remanded the case for re-sentencing, noting that

    we have no reason to believe that the Guidelines have accounted for a defendant's status as a deportable alien in setting the level for that offense. The district court is thus free to consider whether Farouil's status as a deportable alien has resulted in unusual or exceptional hardship in his conditions of confinement. <u>Id</u> at 846.

Defendant urges this Court to review the particulars of Mr. Fleury's situation in the context of the information contained in the Presentence Report and in the other factual and personal contexts he is attempting to put before the Court. The impact on any given federal inmate of a given set of conditions of imprisonment - and, notably in this case, Mr. Fleury's ineligibility for several BOP programs which would normally humanize and benefit his experience in confinement - is undoubtedly very different from the impact on any other inmate. Mr. Fleury, despite the fact that he has no prior record, that there was no violence involved in his offense, and that he was only small part of the conspiracy which constitutes his offense of conviction for a very short time, will never be eligible

for a minimum security institution. Nor will he be eligible for a halfway house, or for community release. Instead, on release from prison, he will in all likelihood spend some further period of confinement in INS custody, and then be deported to the Dominican Republic.

B. **Post-Offense (and Pre-sentence) Rehabilitation; Extraordinary Remorse**

(Counsel would first point out that these two grounds for departure, while often treated separately, in this case are so related that they will be discussed together.)

By the time Defendant is sentenced in this matter, he will have been in custody for approximately twenty-two and a half (22 1/2) months. This has given him a great deal of time for soul-searching and reflection about the serious mistake he made in his forty-fifth year. Mr. Fleury has expressed great remorse and a singular determination to make up for that mistake.

In addition, counsel would add some of his own observations, which concededly should be weighed with great care by the Court for obvious reasons, but which are offered in connection with some of the facts set forth in the Presentence report, and also based on experience with scores of criminal defendants in this Court over quite a few years.

The undersigned has spent a good deal of time with Mr. Fleury, simply because it was required in order to represent him diligently and completely. Mr. Fleury appears to have experienced a very, very unusual depth of remorse and contrition for his conduct. Clearly this cannot be offered as an expert opinion; but it can be offered as a distinction from almost every other defendant the undersigned has represented in this Court. The expressions of remorse which counsel has observed, quite unpracticed and even

ingenuous, appear to be closely related to Mr. Fleury's deep sense of the importance of family.

### C. Totality of the Circumstances

While Defendant feels he has made reasonable arguments for downward departure on each of the grounds set forth above, he would also like to suggest that (1) in this particular case, each of those arguments is fittingly bolstered by the totality of the circumstances surrounding the offense, the personality of the Defendant and personal growth and rehabilitation since his arrest, and the other factors set forth above; and (2) any such departures the Court sees fit to make may also appropriately be enhanced by that totality, or rather unique combination, of all the circumstances made known to the Court.

The United States Court of Appeals for the Second Circuit has generally recognized totality of the circumstances as a valid ground for downward departure. United States v. Rioux, 97 F.3d 648 (2d Cir. 1996). See also United States v. Broderson, 67 F.3d 452, 458-59 (2d Cir. 1995) (relying on United States v. Rivera, 994 F.3d 942 (1st Cir. 1993) (Breyer, J.)) where, in a fraud case, the First Circuit felt that the district court had a "better feel" for unique circumstances of the case, in this case justifying a 7-level downward departure.

### V.     Grounds for a Non-Guideline Sentence

The Defendant wishes to suggest that, by applying the verious sentencing factors set forth in 18 U.S.C. § 3553 (a) to the personal history and characteristics of Mr. Fleury - some of which have been mentioned briefly in section III, above - there are ample grounds for applying a non-guideline sentence in this case.

As a preliminary matter, however, counsel would add what he hopes are some common-sense observations about the post-Booker sentencing climate. The Booker Court certainly wasn't disregarding the Guidelines; nor did it seem to be minimizing their value. It simply put them in context. Indeed, it hardly seems surprising to suggest that a very well-thought out code, no matter how detailed and no matter how carefully it may have been fine-tuned since 1987, can simply not anticipate every unique sent of circumstances that sentencings present. For every rule, there is an exception.

The undersigned practiced criminal law in this court for approximately thirteen years before the Guidelines became the law in 1987, and remembers a number of instances of sentencing disparity, or cases in which he felt that was an issue. One in particular involved sentences of, respectively, six months and six years from two different judges faced with very similar crimes, criminal histories and other factors. The Guidelines have great value.

But the Government sometimes seems to take the position that the Guidelines are presumptively the primary source to which the Court should look in making sentencing determinations. Booker says otherwise.

Turning to some specifics about Mr. Fleury, it would only seem thorough and fair that the Court consider that his circumstances come close to certain established downward departure situations. Before the 2004 amendment regarding "aberrant behavior" (excepting "serious drug offenses") it would seem that may have been a successful ground. And although his role in this offense was neither "minor" nor "minimal", it was certainly not very great. His family circumstances are not "exceptional" but they are a source of much greater sensitivity and concern than is the case with most defendants the

undersigned has represented in drug cases.

Reviewing the § 3553 language, what is a sentence which is "sufficient, but not greater than necessary" to accomplish the statutory objectives?

Based on Mr. Fleury's characteristics, it is respectfully suggested that concern with deterrence should not be a significant factor. Similarly, he has learned his lesson - he is not someone who poses a danger to the public. He could benefit tremendously from educational or vocational training.

Mr. Fleury and his counsel urge the Court to impose a non-Guideline sentence which satisfies the sentencing statute in a way which appropriately reflects the characteristics, history, and needs of the unique human being who will be standing before the Court in approximately one week.

Respectfully submitted this 17th of June, 2005

DEFENDANT
FAUSTINO FLEURY

BY _____

C. Thomas Furniss
fed bar #ct00028
Furniss & Quinn, P.C.
248 Hudson St.
Hartford CT 06106

(860) 527-2245

## **CERTIFICATION OF SERVICE**

I hereby certify that a copy of the foregoing was mailed on this 17th day of June, 2005 to:

Robert Gerard Golger
Quatrella & Rizio
One Post Rd., P.O. Box 320019
Fairfield, CT 06432

Emili Vaziri
160 Plainfield St.
Providence, RI 02909

H. Gordon Hall
U.S. Attorney's Office – NH
157 Church St., 23rd Floor
P.O. Box 1824
New Haven, CT 06510

Dennis Linder
United States Probation Office
915 Lafayette Blvd
Bridgeport CT 06604

C. Thomas Furniss