UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA            :   3:03CR229(RNC)

    VS.

FAUSTINO FLEURY                     :   NOVEMBER 3, 2005

**DEFENDANT'S SUPPLEMENTAL
MEMORANDUM IN AID OF SENTENCING**

    The Defendant wishes to address some of the issues raised in the hearing held in this matter for the purpose of sentencing on June 24, 2005.  A transcript of that proceeding is attached hereto.

    Counsel would suggest that the three principal issues discussed - which are, indeed, critical to a lawful and fair sentencing of this particular Defendant - are:  (1)  what was the <u>scope</u> of Mr. Fleury's agreement to participate in the underlying drug conspiracy?; (2) what was Mr. Fleury's <u>role</u> in the conspiracy?; and (3) given his level of mental functioning, what amount of drugs should be attributed to him for sentencing purposes as being "<u>reasonably foreseeable</u>" to him?

    1.  <u>Scope of the agreement.</u>

    Mr. Fleury plead guilty to Count One of the Indictment in this matter, alleging his participation in a conspiracy which ran "[f]rom July 8, 2003, through the present . . ." and involving "one kilogram or more of a mixture and substance containing a detectable amount of heroin".  (It is assumed that "the present" refers to the approximate date on

which the Indictment was filed, which is August 13, 2003.) Mr. Fleury was arrested on August 6, 2003 after being on the mainland (he came by plane from Puerto Rico) for approximately eight (8) days. Counsel believes that period of time - the 8 days - is not disputed.

In discussions with counsel for the Government, however, it is believed that the Government feels the Court should consider in its assessment of the scope of Mr. Fleury' s agreement - or at least under "relevant conduct" in its analysis of the drug amount attributable - a period of time beginning in the fall of 2002, when in fact Mr. Fleury was in New Haven for some period of time. Defendant wishes to relate his position in response.

The Plea Agreement signed by Mr. Fleury recites as the third element of the offense alleged under Count One that "the conspiracy involved 1 kilogram or more of heroin *under Count One"* [emphasis added]. Count One alleges a conspiracy beginning on July 8, 2003. While there may be "relevant conduct" considerations (which will be dealt with hereinafter), at the very least this is misleading if in fact the Government can include amounts which, possibly, were connected to Mr. Fleury at an earlier time period. It would seem to the Defendant that the principle decided in United States v. Gonzalez, No. 03-1356, 2005 U.S. App. LEXIS 17961 (2d Cir. Aug. 22, 2005) should apply here - if the *amount* of drugs for which a defendant is to be held responsible for in an aggravated drug felony prosecution is an element of the offense, and must be alleged; so, too, *at least* where it could affect the *amount* of drugs forming the basis of a sentence, should the *time period* of the alleged activity be a constitutionally required element. Otherwise the defendant has not pled knowingly and intelligently.

Turning to the specifics before the Court, Mr. Fleury understood through telephone conversations with Daisy Sanchez, and/or one or more of her brothers, that he would be coming to Connecticut for two to three weeks to fill in for Marrero, one of his co-defendants, so that the latter could take a break and return to Puerto Rico for a "vacation".

The Defendant must acknowledge what he anticipates to be the Government's argument about "relevant conduct". It is believed that the Government would argue that the formula contained in United States Sentencing Guidelines §1B1.3(a)(1)(B) including in the offense conduct in a "jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" would apply here, notwithstanding the limitation following the language just quoted that such "acts and omissions of others" must have "occurred during the commission of the offense of conviction". It is believed that that the Government would point to the rule contained in 1B1.3(a)(2) which removes the "offense of conviction" limitation with respect to offenses requiring "grouping" under §3D1.2(d) "all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction". Defendant would simply say that such an inclusion of an earlier time period here, <u>if</u> justified on any basis, would - or certainly could - amount to a violation of what appears to be the underlying constitutional concern of <u>United States v. Gonzalez</u>, <u>supra</u>, that Defendant's plea would not be "knowing and voluntary" in that he was not informed in the plea agreement, as an *element of the offense*, of the actual drug quantity to which he effectively *might* be pleading.

2. <u>Role in the conspiracy</u>

During the hearing on June 24, 2005, Assistant United States Attorney Deborah R. Slater, filling in for AUSA H. Gordon Hall, advised the Court that Mr. Fleury appeared to have been a "lieutenant" in the Daisy Sanchez organization, and "was one of several individuals who was responsible for bringing packaged heroin out to the street sellers in the organization . . ." (Transcript, Sentencing Hearing 6/24/05, p. 19, ll. 22-24.) While it is believed that the Government may have changed its view in that regard somewhat, Defendant does wish to point out several things about Defendant's actual role.

First, Defendant is not aware that the Government at any time has believed that he had significant supervisory duties. He simply didn't. So the usual context of the word "lieutenant", often used in large drug distribution prosecutions, simply didn't exist here. Second, the Presentence Report in this case, which certainly seems to be thorough in every respect, recites at paragraph 10 (p. 4) that "[l]ater in the investigation, Fermin Aquino and Faustino Fleury, aka "Freddy," were found to be *trusted individuals* in the organization, however, *they had no authority over street sellers*" (emphasis added). That Mr. Fleury might be a "trusted individual" is not inconsistent with his rather dramatic intellectual limitations as set forth in Dr. Coric's report (attached) - after all, one would think there could be great advantages to the leaders of the organization to have someone who was not sophisticated but was loyal, had no criminal record, and would do what he was told and not ask questions.

Third, based on Mr. Fleury's limitations - which will be discussed more thoroughly below - it is suggested that he lacked any meaningful ability to instruct and supervise others. "Trusted" doesn't mean "lieutenant", at least not here.

4

3. <u>Reasonable foreseeability</u>

Counsel has attached to this Memorandum a copy of the report of October 31, 2005 from Dr. Vladimir Coric of the Yale University Department of Psychiatry, which report incorporates the testing results and report of Dr. Rafael Gallegos, a Spanish-speaking psychologist. It is felt that these reports are quite thorough, and for the most part speak for themselves. Nonetheless, a few highlights will be pointed out.

Dr. Gallegos, who met Mr. Fleury initially with the undersigned at the New Haven Correctional facility, conducted all his testing and interviewing with Mr. Fleury in the Spanish language. Using what are believed to be standard IQ and related tests - in the Spanish language - he found Mr. Fleury to have a Performance IQ of 58 (Report of Dr. Coric, p. 8). In his "Impressions" section, Dr. Gallegos noted the following:

> While sensorimotor functions and language appeared grossly intact, his level of impairment on intelligence testing is suggestive of neurological inefficiencies often seen in persons with mental retardation who are victims of early deprivation and impoverished environments. Report, p. 10.

Dr. Coric's conclusion, based on the IQ and related testing, Dr. Gallegos' interpretive findings, and on his own lengthy interviews and analysis, was the following:

> In my opinion, within reasonable medical certainty, Mr. Fleury's mild mental retardation to borderline range of intellectual functioning significantly impaired his ability to reasonably foresee that the conspiracy that he participated in involved the distribution of more than one kilogram of heroin. Report, p. 12.

It is anticipated that the Government will argue, quite logically, that there needs to be an objective standard for what is "reasonably foreseeable". As a general matter, that certainly has to be a touchstone of the criminal justice system, at least as it relates to attributing vicarious liability to one defendant based on the conduct of others with whom he or she is associated. Like all rules, however, it is bound to have exceptions.

While the quantities of drugs involved in this case would probably be "reasonably foreseeable" to the average person, or to what might be called a "reasonable man" to borrow from tort law; in this case, to punish Mr. Fleury for cognition that he simply isn't capable of, based on very careful testing, simply seems unfair. And indeed the Sentencing Guidelines recognize a possible downward departure under §5K2.13 for Diminished Capacity. (That argument is not being made here because, again, based on the mental capacity testing and his own knowledge of Mr. Fleury, including but not limited to the findings in the PSR, the undersigned feels that Mr. Fleury appreciates the wrongfulness of his conduct and never had the impression that he was <u>not</u> doing something illegal.) But he had no idea of the amount of drugs involved.

While the undersigned does not claim to have done exhaustive research on case law involving sentencing of defendants with borderline mental capacity, a significant effort led to some helpful language from the Circuit Court of Appeals for the Eighth Circuit (although in a dissent). In <u>Jones v. United States</u>, No. 97-1344 (8th Cir. 05/27/1998), the Defendant was the only one of twenty-one alleged conspirators to go to trial in an alleged heroin conspiracy in violation of 21 U.S.C. §846. He was sentenced to 360 months' imprisonment, while the two ringleaders were each sentenced to 276 months.

Circuit Judge Bright, in dissent, seems to have been mostly concerned about the rigid application of the Sentencing Guidelines, at least in this case:

> The sentence of Jones, a man with the mind of a child, to thirty years of incarceration makes a mockery out of the phrase "Equal Justice Under the Law." In this case, the lowest person on the totem pole, a mere street-level dealer with an I.Q. of fifty-three received a heavier sentence than the master-mind of the conspiracy and the conspiracy's primary drug supplier. What kind of a system could produce such a result? This case proves yet another example of how rigid sentencing guidelines and the mandatory minimums associated with drug cases make an unfair "criminal" system. Moreover, even under the

> Sentencing Guidelines the district court should have determined that Jones' limited mental capacity probably prevented him from comprehending the conspiracy's activities other than those sales that he personally made.Id at p. 5.

Circuit Judge Bright went on to express his opinion that it was plain error for the district court to attribute to Defendant Jones almost the entire amount of drugs sold by the whole conspiracy:

> What would the reader of this opinion think about a thirty-year prison sentence for an eight-or nine-year-old boy (the mental level at which Jones functions), who was charged with drug distribution? A person of this level of intelligence is not likely to comprehend the scope of the conspiracy. Simply stated, Jones did not possess the mental capacity to comprehend the drug distribution scheme beyond performing the tasks that he was ordered to do.

The Judge went on to comment on the Government's sentencing argument that the mastermind of the conspiracy considered Defendant Jones to be one of his most trusted employees: "Sykes would no doubt consider Jones a trusted employee because Jones did only what Sykes and others told him to do and knew nothing of the overall scheme."

While this opinion in dissent cannot be said to have any precedental value, it would certainly appear to represent the very strong feelings and humane approach of a jurist in one of our higher courts, and would seem to come from a context very similar to the present one.

   4. Additional points

Finally, Defendant wishes to state explicitly two matters that are certainly implicit in the three issues discussed above, but which should be stated independently.

(I) Three of the factors contained in 18 U.S.C. §3553 (a) would appear to call for special attention in this case.

First, subparagraph (1) - "the nature and circumstances of the offense and the history and characteristics of the defendant". It is felt that this Memorandum has dealt

7

adequately with the "history and characteristics", and that those aspects of this Defendant strongly suggest (i) that no more than a minimal specific quantity of the drugs involved in this conspiracy should be attributed to him; and (ii) that there are very sraightforward reasons for the Court to be lenient in sentencing him.

Second, Defendant wishes to discuss two of the considerations from subparagraph (2) - "the need for the sentence imposed":

(B) to afford adequate deterrence to criminal conduct. In the experience of this writer, which includes the handling of several scores of federal criminal cases, mostly involving drugs, it is hard to imagine a defendant who is more remorseful than Mr. Fleury. He is a simple man who comes from an impoverished but close family. He came to New Haven for a short period of time because he was having financial difficulty supporting his Wife and step-daughter. Although he knew what he would be doing was illegal, he had no idea of the scope of the operation and no concept of what the penalties were. There is simply no reasonably imaginable prospect that this man will offend again.

(C) to protect the public from further crimes of the defendant. This factor, of course, is somewhat different from the consideration in (B), discussed above. In simple terms, (C) appears to address how long an inmate should be secured in prison to protect the public in a mechanical sense, rather than a concern with deterrence, or a desired effect on the inmate's personality which can be internalized and therefore operate to protect society. However, counsel would make the same point that was made above regarding Mr. Fleury - he won't offend again, and he doesn't need (as an incentive in that regard) more than the twenty-seven (27) months he will have served when he is sentenced to learn a lesson.

(II) As pointed out in Defedant's original Memorandum in Aid of Sentencing dated June 17, 2005 (on page 7), Mr. Fleury did not even know exactly what drug he was delivering. He assumed it was either cocaine or heroin, but he really didn't know. While the Government may challenge this representation, and may produce testimony whose purpose is to refute it or call it into question, the undersigned fully believes Mr. Fleury is telling the truth - he simply didn't know. Given his intellectual limitations and lack of *any* experience with drugs beyond smoking part of a marijuana cigarette which made him ill, this is certainly credible.

If, indeed, the Court finds that Mr. Fleury thought he was delivering cocaine or heroin, one or the other, then how can he be sentenced under the heroin Guidelines? It would seem that <u>United States v. Gonzalez</u>, <u>supra</u>, would suggest that the *particular* drug is an element of the offense, and that Mr. Fleury could not be sentenced to anything *higher* than what would be called for under the sentencing guidelines for cocaine. And, *even if* the Court found Mr. Fleury to be involved with as much as 1 kilogram of cocaine, his base offense level would be 26 rather than 32 (for heroin), and his adjusted sentencing range would be at level 21, or 37 to 46 months. If counsel's calculations are correct, netting out the statutory "good time" and the time Mr. Fleury has served since his arrest on August 6, 2003, if sentenced on November 7, 2005 to the guideline minimum of 37 months the Defendant would be facing approximately 4.5 months' additional incarceration.

The above is pointed out, first, simply to give some practical context to the Court's considerations and, second, to suggest that the interests of justice in this matter suggest flexibility and leniency.

Respectfully submitted this         of  November, 2005

                           **DEFENDANT**
                           **FAUSTINO FLEURY**

                           BY_____

                           C. Thomas Furniss
                           fed bar #ct00028
                           Furniss & Quinn, P.C.
                           248 Hudson St.
                           Hartford CT 06106

                           (860) 527-2245

## **CERTIFICATION OF SERVICE**

I hereby certify that a copy of the foregoing was mailed on this        day of November, 2005 to:

Robert Gerard Golger
Quatrella & Rizio
One Post Rd., P.O. Box 320019
Fairfield, CT 06432

Emili Vaziri
160 Plainfield St.
Providence, RI 02909

H. Gordon Hall
U.S. Attorney's Office – NH
157 Church St., 23rd Floor
P.O. Box 1824
New Haven, CT 06510

Dennis Linder
United States Probation Office
915 Lafayette Blvd
Bridgeport CT 06604

And that a copy of the foregoing was sent by e-mail to AUSA Hall at: gordon.hall@usdoj.gov on 11/03/05.

                           _____
                           C. Thomas Furniss